IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CENTER FOR BIOLOGICAL DIVERSITY,
et al.,

                Plaintiffs,

v.                          No. CIV 03-252 LFG/LAM

GALE NORTON, in her official capacity as
Secretary of the Interior, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

### Introduction

THIS MATTER is before the Court on Plaintiffs' Motion for Review of Agency Action, filed July 2, 2004 [Doc. No. 29] and Plaintiffs' opposed request for evidentiary hearing on the Motion for Review, filed December 29, 2004 [Doc. No. 54]. The Motion for Review is fully briefed. The Court has carefully considered the pertinent law, pleadings, supplemental authority provided by Plaintiffs, and the Administrative Record ("AR")[1] in this case. In order to assist the Court with its determination on the Motion for Review, the Court will direct Defendant Secretary to address limited issues through supplemental briefing, and will then permit Plaintiffs to file a response to that

---

[1] In the Court's review of an agency decision, the general rule requires the district court examine the "whole record" or the "full administrative record that was before all decision makers . . . at the time [the agency made] the decision." Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993) (internal citations omitted). The Administrative Record in this case includes approximately 24 large 3-ring binders containing about 9500 pages. For additional discussions of the Administrative Record and what Plaintiffs sought to have the Court review, see Court Opinions, issued July 20, 2004 and March 3, 2005 [Doc. Nos. 36 and 63].

1

supplemental briefing. The Court summarizes the background and issues involved in this case below, and sets forth the limited area of supplemental briefing it seeks.

## **Background**

Plaintiffs' lawsuit challenges the Fish & Wildlife Services's ("FWS's") June 2002 finding that it was not warranted to list the Rio Grande cutthroat trout[2] ("RGCT") under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44. [Doc. No. 13, IPTR, p. 1.] The RGCT is the southernmost of 14 subspecies of cutthroat trout. AR, FWS .1009. It is dark olive in color with sparsely scattered black spots. The RGCT, New Mexico's state fish, gets its name from parallel scarlet stripes on the underside of its jaw and is native to the cold water mountain streams and lakes of Northern New Mexico and Southern Colorado. New Mexico Blue Book, 2001-2002 (Publication of the New Mexico Secretary of State); [Doc. No. 1, ¶ 18]. The historical distribution of the RGCT is not known with certainty. 67 F.R. 39936. "[I]t is assumed that RGCT occupied all streams capable of supporting trout in the Rio Grande and Pecos basins. It is unclear if RGCT were also present in the Canadian River Basin." 67 F.R. 39936; AR, FWS .1009. Its distribution, however, was likely limited to cold water mountain streams.

Plaintiffs are Center for Biological Diversity, Biodiversity Conservation Alliance, Carson Forest Watch, Center for Native Ecosystems, Pacific Rivers Council and Michael Norte. Most of Plaintiffs are non-profit organizations. Mr. Norte is "an avid catch and release flyfisher." [Doc. No. 1.] Plaintiffs bring their Complaint for Declaration and Injunctive Relief alleging that Defendants violated the ESA by not listing the RGCT and violated the Administrative Procedures Act ("APA")

---

[2]The RGCT (*oncorhynchus clarki virginalis*) is closely related to two other cutthroat subspecies, the large-spotted greenback cutthroat trout and the Colorado cutthroat. AR, FWS .50.

by making a decision that was arbitrary and capricious, an abuse of discretion and/or not in accordance with law. [Doc. No. 1, First and Second Causes of Action.] Plaintiffs seek an injunction to vacate the "not warranted" decision and an order requiring Defendants to issue a new rulemaking and new finding on the RGCT within 60 days. Plaintiffs also request an award of costs and fees. [Doc. No. 1.]

Plaintiffs allege *inter alia* that the historic range of RGCT has been drastically reduced for a number of reasons, including fragmentation, environmental events such as fire or drought, loss of genetic diversity, changes in population structure, human activities, water diversions and dams, livestock grazing and logging, pollution of streams, the spread of non-native trout and the presence of whirling disease. [Doc. No. 1.] As a result, Plaintiffs requested that FWS list the RGCT as threatened or endangered under the ESA.

## Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species. . . ."[3] 16 U.S.C. § 1531(b). The legislative history of the ESA contains support for the proposition that Congress intended that

---

[3] One federal court described the enactment of the ESA in the following terms: "Congress enacted the ESA in 1973 out of deep concern for preservation of America's wildlife. The ESA aims 'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species.' The Supreme Court found that Congress intended 'to halt and reverse the trend toward species extinction, whatever the cost.' The ESA provides an array of statutory, protections to species listed as "endangered" or "threatened." If a species is listed under the ESA, the Secretary, must not merely avoid elimination of that species, but is required to bring the species back from the brink sufficiently to obviate the need for protected status. Thus, 'listing is critically important because it sets in motion the Act's other provisions, including the protective regulations, consultation requirements, and recovery efforts.'" Federation of Fly Fishers v. Daley, 131 F. Supp. 2d 1158, 1163 (N.D. Ca. 2000) (internal citations omitted).

preventive action to protect species be taken "sooner rather than later." "By heeding the warnings of possible extinction today, we will prevent tomorrow's crisis." Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 680 (D.D.C. 1997) (internal citations omitted).

A species receives the protections of the ESA when the FWS lists the species as "endangered" or "threatened." A species is deemed "endangered" when it is "in danger of extinction *throughout all or a significant portion of its range*[4] . . . ." 16 U.S.C. § 1532(6). A "threatened" species is defined as "likely to become an endangered species within the foreseeable future *throughout all or a significant portion of its range*." Id. at § 1532(20). A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. at § 1532(16).

The ESA directs the Secretary of the Interior to determine which listings to make, based on the determination of whether that species is threatened or endangered. 16 U.S.C. §§ 1533(a), 1532(15). Plaintiffs bring this lawsuit against Gail Norton, Secretary of the Interior. However, the FWS is involved in making the initial decision whether to list a species as threatened or endangered whenever any one of the following factors is met:

(1) the present or threatened destruction, modification, curtailment of its habitat or range;

(2) overutilization for commercial, recreational, scientific, or educational purposes;

(3) disease or predation;

(4) the inadequacy of existing regulatory mechanisms; or

(5) other natural or manmade factors affecting its continued existence.

---

[4]The Court italicized this portion of the statutory language because this language is at the heart of Plaintiffs' primary argument that FWS violated provisions of the ESA.

Id. at § 1533(a)(1); 50 C.F.R. § 424.11(c).

The FWS must make listing determinations "solely on the basis of the best scientific and commercial data available," without reference to the possible economic or other impacts of such a determination. Id. at § 1533(b)(1)(A). "Reliance upon the best available scientific data, as opposed to requiring absolute scientific certainty, 'is in keeping with congressional intent' that an agency 'take preventive measures *before* a species is 'conclusively' headed for extinction.'" Center for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223, 1236 (W.D. Wa. 2003) (internal citations omitted) (emphasis in original). If a species is listed, various protections are engaged both as to the members of the species and the species' critical habitat. 16 U.S.C. §§ 1536, 1538.

Plaintiffs brought this case to the attention of the FWS through the ESA's citizen's petition provision. Id. at § 1533(b)(3)(A). On February 25, 1998, Plaintiffs petitioned the FWS to list the RGCT as either endangered or threatened under the ESA. AR, FWS .46-.89. On September 14, 1998, the FWS issued a negative 90-day finding. 63 F.R. 49062; AR FWS .1010. On June 9, 1999, Plaintiffs challenged this decision. 67 F.R. 39936. The FWS subsequently determined, based on receipt of additional information, that listing the RGCT "may be warranted." AR, FWS .1010. The case then settled on November 8, 2001, with the understanding that the FWS would conduct a "status review," consisting of information gathering as to the status of the RGCT. *See* AR, FWS .1006.) The FWS's status review lasted approximately six months. On June 3, 2002, the FWS made its "not warranted" listing decision and that decision was published in the Federal Register on June 11, 2002. 67 F.R. 39936. Plaintiffs' federal lawsuit followed.

On July 2, 2004, Plaintiffs filed their Motion for Review of Agency Action, which is sometimes likened to a motion for a summary judgment (even though the Rule 56 standard of review

5

is not employed). In opposition to the Motion for Review, Defendants generally argue that the FWS utilized its biological expertise to assess the present status of the RGCT and that the best available scientific data[5] did not support listing the RGCT.

## Standard of Review

Judicial review of administrative decisions involving the ESA is governed by the APA, § 706. 5 U.S.C. § 706.[6] Center for Biological Diversity v. Morgenweck, 351 F. Supp. 2d 1137, 1140 (D. Colo. 2004) (*citing* Friends of the Bow v. Thompson, 124 F.3d 1210, 1214-15 (10th Cir. 1997)). "Under the APA, the reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413-14 (1971) (internal citation omitted), *overruled on other grounds by* Califano v. Sanders, 430 U.S. 99, 105 (1977); 5 U.S.C. § 706(2)(A). The Court may not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, 401 U.S. at 416.

> The court's limited role is to ensure that the agency's decision is based on relevant factors and not a "clear error of judgment." If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld." This standard presumes the validity of agency action. Deference to an agency's scientific and technical expertise dictates that agency action must be upheld as long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." . . . In exercising its narrowly defined duty under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision on facts in the record, and whether the

---

[5]The "best available data" standard requires far less than "conclusive evidence." Defenders of Wildlife, 958 F. Supp. at 680. The Ninth Circuit Court of Appeals explained that the "best available data" standard was intended to give "the benefit of the doubt to the species." Id. In other words, the ESA does not require "certainty" before listing is warranted. Id. at 680-81. *See also* Lohn, 296 F. Supp. 2d at 1236.

[6]Because the ESA does not provide a provision for judicial review, Plaintiffs' claims are subject to review under the APA. Sierra Club v. Bosworth, 352 F. Supp. 2d 909, 917 (D. Minn. 2005.)

>agency considered the relevant factors. The court must defer to the agency's expertise, particularly with respect to decision-making which involves "a high level of technical expertise."

Defenders of Wildlife, 958 F. Supp. at 678-79 (internal citations omitted).

Thus, under this standard of review, the Court's own view of whether or not a listing is appropriate is of no consequence. Due to their expertise and unique qualifications, administrative agencies such as the FWS, have been authorized by Congress to make these determinations so long as the agencies comply with certain requirements. Stated differently, a court sets aside an agency decision as arbitrary and capricious if the agency (1) relied on factors that Congress did not intend it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. Sierra Club, 352 F. Supp. 2d at 917 (*citing* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); Friends of the Bow, 124 F.3d at 1215.

Notwithstanding the deference owed to an agency decision, such deference is not unlimited. Defenders of Wildlife, 958 F. Supp. at 679. For example, an agency's decision should not be upheld if it is demonstrated that the agency failed to articulate a reasoned basis for its decision, or if the agency fails to articulate a rational connection between the facts found and choices made. Id. (internal citations omitted). In addition, the deferential standard "does not shield the agency from a 'thorough, probing, in-depth review.'" Lohn, 296 F. Supp. 2d at 1232 (internal citation omitted). The "thorough and probing" review, however, is not license for substitution of judgment. The court's inquiry "must be searching and careful, but the ultimate standard of review is a narrow one." Custer

County Action Ass'n v. Garvey, 256 F.3d 1024, 1030 (10th Cir. 2001) (*citing* Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989), *cert. denied,* 534 U.S. 1127 (2002).

## Discussion

### I.      Significant Portion of Range

Under the "definitions" provision of the ESA, both terms "endangered species" and "threatened species" are defined, in part, as any species in danger of extinction or likely to become an endangered species in the foreseeable future "throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20).  Section 1533 of the ESA provides that the Secretary determines whether any species is endangered or threatened based on the five factors listed *supra*, including "the present or threatened destruction, modification, or curtailment of its habitat or range."  16 U.S.C. § 1533(a)(1)(A).

In Defenders of Wildlife v. Norton, 258 F.3d 1136, 1140-45 (9th Cir. 2001) ("Defenders" or "the lizard case"), the Ninth Circuit provides the most detailed analysis of the language in question, *i.e.,* "throughout all or a significant portion of its range."  The Court rejected the Secretary's explanation of the statutory language and also dismissed Defenders' quantitative approach based on the percentile loss of a species' habitat. The Court proceeded to analyze the legislative history of the language, concluding that the broader extension of the Act's protection, as passed in 1973 to include the language in question, was a "significant change." Id. at 1144.  "[T]he new definition's expansion to include species in danger of extinction 'in *any* portion of its range' represented ' a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction.'" Id. (citations to legislative history omitted).

In the lizard case, the Ninth Circuit further observed that under this view an animal could be "endangered" in most States while overpopulated in others. In States where the animal is overpopulated, the Secretary would have the discretion to list the animal as merely threatened or to remove it from the endangered species listing entirely while still providing the Act's protections to those areas where the animal is endangered. In other words, with this newer statutory definition (described by one Senator as "perhaps the most important section of this bill"), the Secretary and State agencies were provided more extensive discretionary action. Id.

The Ninth Court concluded that "a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was. Those areas need not coincide with national or state political boundaries, although they can." Id. at 1145. This expansive interpretation of the statute could authorize a species listing as soon as there was a conclusion, based on the best scientific and commercial data available, that a species once was viable in a significant portion of its historic range, but is no longer viable throughout that historic range.

In Defenders, the Court further found that the Secretary has a wide degree of discretion in delineating "a significant portion of [the animal's] range" but that where it was "apparent [on the record] that the area in which the lizard is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" Id. (internal citation omitted). The Ninth Circuit relied on an earlier decision where the Court noted that the focus of judicial review of an agency action is not on the wisdom of the agency's decision, but rather on the question of whether the agency took into consideration all the relevant factors. Id.

9

The Secretary, in the present case, distinguishes the lizard case on grounds that the decision was based on the unique circumstances of its own administrative record and also because in that case, FWS had not examined the risk to the lizard outside of federal lands and had made no assessment as to the significance of the diminution of the lizard's historic range. Here, in contrast, the Secretary argues that the FWS did evaluate the extinction risk to the RGCT throughout its range.

The Court agrees that this case is distinguishable in many ways from the lizard case. For example, in the lizard case, the Secretary did not expressly consider the "significant portion of its range" issue *at all* in her Notice. Thus, the Ninth Circuit observed it owed no deference to the Secretary's interpretation since it could not "defer to what we cannot perceive." Id. at 1146, n. 11. Ultimately, the Ninth Circuit found the Secretary's omission to be arbitrary and capricious, and remanded.

In the present case, the Secretary did not ignore the historical range argument as occurred in Defenders, and instead, discussed the statutory language– "throughout all or a significant portion of its range." The proposed rule provides in part:

> The historic range of RGCT has been greatly reduced over the last 150 years. Many populations have been lost or impacted by water diversions, dams, habitat degradation, changes in hydrology, hybridization with rainbow trout, or competition with brown or brook trout. Quantifying the exact magnitude of loss in either number of fish or habitat is difficult because there are no baseline data. Stumpff and Cooper (1996) estimated the loss in habitat (stream miles to be about 91 percent in New Mexico. Harig and Fausch (1998) suggest that native cutthroat (greenback and RGCT) have been reduced to less than one percent of their historic habitat. Because RGCT are now restricted to headwater and first and second order streams that are narrow and small compared to larger second, third, and fourth order streams they once occupied, the absolute loss of habitat is greater than stream miles might indicate and includes the loss of diversity of habitat

10

> found in larger stream systems. As a consequence of the habitat loss, RGCT populations that were once connected are now fragmented.
>
> . . . The greatest contraction in RGCT habitat most likely occurred between 1880 and 1973. . . .As a result of these multiple impacts, reduction of RGCT habitat occurred range-wide, affecting essentially every watershed.
>
> Habitat fragmentation reduces the total area of habitat available, reduces habitat complexity and isolates the fragments. . . . RGCT are restricted to fragments of streams. . . . . Burkey (1995) suggests that fragmentation accelerates extinction, especially when dispersal among fragments is not possible, as is the case with some RGCT populations. . . .

67 F.R. 39940.

Near the end of the proposed ruling, the FWS further states:

> The Act does not indicate threshold levels of historic population size at which (as the population of a species declines) listing as either "threatened or endangered" becomes warranted. Instead, the principal considerations in the determination of whether or not a species warrants listing as a threatened or endangered species under the Act are the threats that currently confront the species and the likelihood that the species will persist in the "foreseeable future."

67 F.R. 39946.

Thus, FWS acknowledged that the RGCT's historic range had been significantly narrowed due to a multiplicity of factors primarily occurring in the 93-year period between 1880 and 1973. But, having acknowledged the serious depletion of the RGCT's historic range, the FWS focused on current conditions, current threats, current affirmative steps being taken to protect and stabilize the species, and risks that the RGCT would face in the foreseeable future.

11

The FWS proceeds to summarize its discussion of the specific threats to the RGCT and then states that it has "determined that the 13 core populations[7] are not threatened by any of the identified threats alone or in combination." Id. The FWS further explains that its finding is based upon the 13 core population but also other large populations of RGCT, as well as 21 other populations discussed in the proposed ruling (those populations, unlike the 13 core populations, encounter more of the threats and/or are less stable/secure than the 13 core populations)

Plaintiffs contend that the FWS analyzed only the "current range" of the RGCT, instead of its historical range and the changes to that range. They further argue that FWS violated provisions of the ESA by failing to consider whether the RGCT is in danger of extinction in a significant portion of its range. According to Plaintiffs, an ESA listing "must occur" when a species is in danger of extinction throughout its entire range, as well as when endangerment extends to a "significant portion of its range."

The Court disagrees. This approach would require a listing in each instance in which evidence exists that a particular species no longer occupies its historic range. Thus, rather than being a factor the FWS should appropriately consider, the FWS's discretion would be virtually non-existent and a finding that a species – any species – no longer occupies the territory it once did, would swallow up every other consideration or determination that could be made based on the best scientific and commercial data available. In other words, present conditions or present steps to protect and manage

---

[7]In its Proposed Rule, FWS observed that it was estimated that there were 106 populations of RGCT in New Mexico and 161 in Colorado in both streams and lakes (totaling 267). Many of these populations were noted as being hybrids; some of the populations had "extremely low" number of individuals; and some had been invaded by nonnative salmonids that either hybridized or competed with the RGCT. 67 F.R. 39937. The FWS proceeded to identify the criteria (genetic purity, population stability and population security) for its definition of "core" populations of the RGCT, of which it determined there were 13 core populations in New Mexico and Colorado, having 2500 or more individuals.

a species, even if successful, would have no bearing on a decision if evidence supported the finding and conclusion that a significant portion of the species historical range has been depleted. A simple reading of the Lewis and Clark Journals describing the abundance of wildlife like elk, deer, bear and antelope, and a comparison to the significantly narrower ranges occupied by these species today would, under Plaintiffs' theory, mandate a listing of all these animals. The Court simply cannot adopt such a narrow view.

While FWS admittedly recognized that the RGCT had been eliminated from 99% of its habitat, Plaintiffs posit that FWS did not determine whether 99% is a significant portion of the trout's historic range. Moreover, Plaintiffs argue that FWS did not consider whether the documented threats to 254 of 267 populations, or 95% of remaining RGCT populations, amount to a significant portion of the trout's range. Thus, Plaintiffs' position is that FWS violated the agency's legal mandate to consider a relevant factor under the ESA by its failure to analyze and consider the trout's historic range and reduction to its range.

The Secretary, unfortunately, does not appear to give Plaintiffs' significant challenge much weight. Instead, the Secretary devotes only the last three pages of her 27-page response to this issue. She states that the loss of historic range, "in and of itself" is not the sole factor to be analyzed. The Court agrees with the statement but disagrees with the inference drawn therefrom that the historical range factor is insignificant. The Secretary also argues that FWS "noted that the historical distribution of the RGCT is not known with certainty, but its current range-wide distribution has not changed substantially from its known historical distribution." [Doc. No. 43, p. 25.] In support of this statement, the Secretary cites portions of the proposed rule, and yet the Court does not find specific support in the rule that "the current range-wide distribution has not changed substantially

from its known historical distribution." Instead, the passage of the rule cited and quoted by the Secretary emphasizes the uncertainty of the historical distribution. Moreover, the "implicit conclusion" that the Secretary contends was reached by the FWS simply is not stated with sufficient clarity for the Court to locate it, implicit or otherwise, on the pages cited.

While the FWS mentions that the RGCT may go extinct in all or a significant portion of its range, it appears to have merely articulated the language, without much more. In comparison, many of the materials in the Administrative Record indicate that researchers concluded that the RGCT's historical range has been greatly affected over time.

> "RGCT currently occupies significantly less of its native range than it did historically and some population segments are at risk of extirpation." (AR, FWS .721.)

> "In New Mexico, the RGCT occupies only 9 percent of its former range . . . . Most streams inhabited by RGCT are small, low productivity headwater streams where space and resources are limited." (AR, FWS .1170.)

> "RGCT have been replaced by nonnative trout throughout most (ca. 90-95%) of their historic range, but many pure populations have persisted in small headwater streams of the Rio Grande basin in Colorado and New Mexico (about 75 streams), and in a few tributaries to the Pecos and Canadian River drainages of New Mexico." (AR, FWS .1201.)

> "The long historical decline of the RGCT has been reversed during the past 25 years. . . . Eventually, . . . public policies and natural resource programs change for the better, but there can be a considerable lag time before enlightenment takes hold." (AR, FWS .1202.)

> "A decline in population size is not limited to RGCT. Two cutthroat subspecies, the yellowfin cutthroat . . . and the Alvord cutthroat . . . are now extinct. There are eight cutthroat trout subspecies that have been classified as special concern, threatened, or endangered." (AR, FWS .1309.)

> "This subspecies [RGCT] is rare throughout its original range in Colorado and New Mexico." (AR, FWS .179)

"Historically, the distribution of RGCT . . . included most of the headwater streams and other coldwater habitats in the Rio Grande drainage of Colorado. There is also evidence that the [RGCT] was native to the Canadian River. Since the late 1800s the distribution of [RGCT] has greatly diminished. A conservative estimate is that it occurs in less than 1% of its original habitat." (AR, FWS .190.)

"With the drastic reduction in the amount of preferred habitat through human encroachment, only the most isolated populations of [RGCT] and their habitat have survived intact." (Id.; AR, FWS .202.)

"Presently the RGCT occupies less than 10% of its historic range and is restricted mainly to head-water systems." (AR, FWS .201, .203, .302.)

"Populations of cutthroat trout . . . have been in a state of decline for many decades throughout the western United States. Behnke (1972) estimated that 99% of the original interior cutthroat trout populations have gone extinct within the last 100 years, and that only 2 of 13 subspecies of interior cutthroat trout stocks are stable or increasing in number . . . ." (AR, FWS .214.) "[M]ost subspecies now exist in only small portions of their historical range." (Id.)

"RGCT occur in about 14% of its original habitat." (AR, FWS .288.)

"The formerly widespread RGCT currently occupies less of its native range than it did historically and some population segments are at risk of extirpation." (AR, FWS, .376.)

"RGCT have been extirpated from a significant portion of their historic range in the Southwestern United States." (AR, FWS, .443.)

"The RGCT are now found only in small mountain streams primarily on Forest Service lands in Northern New Mexico and Southern Colorado." (AR, FWS, .1026.45.)

FWS's proposed rule acknowledges some of the above stated information in its comment that the historic range of the RGCT has been greatly reduced over the last 150 years and that the fish's habitat has been degraded by many activities. However, the FWS did not thoroughly explain why the reduction of and degradation to the RGCT, along with the loss of fish and habitat, did not warrant

15

a listing. This is the area of briefing that the Court will ask the Secretary to supplement, as is described more fully below.

**II.     Agency's Reliance on 13 Core Populations of RGCT**

Plaintiffs also challenge the FWS's use of 13 core populations of RGCT in a variety of ways. They assert that the FWS's application of some of the criteria, i.e., barriers and population counts, for establishing "core" populations does not rely on the best available scientific information. Even if the FWS properly applied the correct criteria, Plaintiffs argue that the FWS improperly examined individual and isolated populations of RGCT instead of looking at the subspecies as a whole. Plaintiffs further contend that the FWS never explained why 13 core populations were enough to sustain the entire species. Finally, Plaintiffs assert that the FWS's application of the five ESA listing factors to the 13 core populations was not a "reasoned evaluation" based on the best scientific evidence available. For example, Plaintiffs observe that some of the assessments conducted showed 9 of 13 core populations faced serious or moderate habitat threats and that whirling disease threatened all 13 populations.

While the Court might tend to agree with some and disagree with other conclusions reached by the agency, the Court is not to substitute its judgment for that of FWS. *See* Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. Here, the Court cannot conclude that the FWS's reliance on 13 core populations and its application of the criteria to identify these core populations was not rational. The FWS appears to have examined the relevant data, after having collected and analyzed many thousands of pages of scientific research and information over a six-month period, and to have articulated a satisfactory explanation for its action in identifying and relying on 13 core populations of RGCT.

16

In addition, the FWS clearly considered each and every relevant listing factor set out under the ESA. The FWS further explained that while it focused its analysis on 13 core populations, it also considered other populations of RGCT in reaching its determination.

> We recognize that our criteria [for establishing the core populations] are conservative, and that population estimates are not precise. For these reasons we also evaluate non-core populations (discussed in the conclusion) that do not meet all of the core criteria but are important components of the range-wide population.

67 F.R. 39937.

It is true that while FWS discusses each of the listing factors rather extensively, it then reaches its conclusion primarily with respect to the 13 core populations.[8] Notwithstanding the FWS's focus on the 13 core populations, the Court is not inclined to find the FWS's analysis and determination regarding the 13 core populations to be "arbitrary and capricious."

## III.   Issues to be Addressed through Supplemental Briefing

The Court allows Defendant up to 25 pages of supplemental argument. Defendant should attach copies of the supporting evidence, where necessary and possible, or refer to the Administrative Record.[9] Plaintiffs then will have an opportunity to respond to FWS's supplemental briefing, but only

---

[8] "[T]he Service determines that habitat condition is not a threat to the 13 pure, stable, and secure populations or to the populations with 500 to 2,500 fish." "The Service determines that overutilization for recreational and scientific purposes is not a threat to the 13 pure, stable, and secure populations . . . ." "The Service determines that [whirling disease] is not a threat to the 13 pure, stable, and secure populations . . . ." "the Service cannot determine if fire is a threat to the 13 pure, stable, and secure populations." "The Service determines that electrofishing is not a threat to the 13 pure, stable, and secure populations." "The Service determines that hatchery management is not a threat to the 13 pure, stable, and secure populations."

[9] Any evidence that the parties rely on in the supplemental briefs should be part of the Administrative Record that was before the agency at the time it made its decision. To the extent possible, the parties should attach to the supplemental briefs all of the key (excerpted and highlighted) evidence that they wish to emphasize. Any of the above-stated questions are to be answered with respect to the time period the Agency made its decision.

to the narrow issues covered in the supplemental brief. Both parties should make every effort not to duplicate earlier briefing and to present succinct arguments.

1) In looking at the question of "range," does the agency examine current range, historic range, or both in deciding whether a species is threatened or endangered? At the time of the Agency's decision, what was the current range of the RGCT? What was its historical range? Does the RGCT's current range (at the time of the decision) constitute a significant portion of its range, or not?

2) If the RGCT is well protected or well managed in the current range but absent or significantly reduced from its historical range, how should the Ninth Circuit's decision in <u>Defenders of Wildlife</u> be applied?

3) If Plaintiffs' argument is understood to mean that the RGCT should be listed under the ESA because its <u>historic</u> range has been reduced significantly, does this mean that virtually all or many animal or plant species should be listed under the ESA based on the argument that a significant reduction of the species' historic range has occurred?

4) Did the Agency conclude that the RGCT was not threatened or endangered "throughout all or a significant portion of its range"? Where is this stated in the proposed rule? If the FWS did so conclude, provide the evidentiary support for this conclusion, including maps.

5) Is the Agency "required" to list the RGCT if it is determined that the RGCT is "threatened" or "endangered" "throughout all or a significant portion of its range"? If not, why not? If so, why is listing required under the language of the ESA?

## Conclusion

Based on the above discussion, the Court concludes that in order to reach a final determination on Plaintiffs' Motion for Review, Defendant should submit its supplemental briefing on the above stated issues by no later than **July 20, 2005,** and Plaintiffs will then have **thirty days** in which to respond.  Neither brief should exceed 25 pages.  The Court, therefore, defers ruling on both Plaintiffs' request for a hearing and their Motion for Review until further analysis of the issues.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge
(sitting by designation)